UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:


CHARLES FRANKLIN,

      Plaintiff,

v.

PRISONER TRANSPORTATION SERVICES, INC.
f/k/a PRISONER TRANSPORTATION SERVICES,
LLC, PTS OF AMERICA, LLC, BREVARD
EXTRADITIONS, LLC, U.S. CORRECTIONS,
LLC, AND JOHN DOES 1-4,

      Defendants.
_____ /



## COMPLAINT FOR DAMAGES
### (Jury Trial Demanded)



DAVID A. FRANKEL
Law Offices of David A. Frankel, P.A.
4601 Sheridan Street, Suite 213
Hollywood, FL 33021
(954) 683-0300
david@BlueLotusLaw.com
eService@BlueLotusLaw.com
paralegal@Bluelotuslaw.com
FLA. BAR NO.  741779

*Attorneys for Charles Franklin*

Plaintiff, CHARLES FRANKLIN ("FRANKLIN" or "Plaintiff"), sues the Defendants, PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC; PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC; U.S. CORRECTIONS, LLC, and the JOHN DOE Defendants 1, 2, 3, and 4 jointly and severally, and states the following:

## JURISDICTION AND VENUE

1.     This action is brought by Plaintiff against a private prison transport conglomerate, PRISONER TRANSPORTATION SERVICES, Inc. and its subsidiary companies, PTS of AMERICA, BREVARD EXTRADITIONS and U.S. CORRECTIONS (collectively referred to as the "Corporate Defendants" or "PTS") and four of its extradition agents, pursuant to state tort law of the State of Florida, 42 U.S.C. §§1983, 1988, and the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, the constitutional provisions mentioned above, and under Missouri state tort laws. Supplemental jurisdiction, and joinder of parties for state law claims are proper pursuant to 28 U.S.C. §1367(a) because they form part of the *same case or controversy*.

2.     Venue is proper in this Court because, the Defendants, and all of its subsidiaries, operate and conduct business across the United States of America, including the Southern District of Florida; therefore, no one venue is more appropriate than another.

## INTRODUCTION

3.     The corporate Defendants are all one private company doing business and known by different names, transporting prisoners and pretrial detainees to and from state prisons, county jails, and detention centers across America. Based on the complete identity of ownership,

operations, management, policies, practices, customs, training, and other facets of the corporate Defendants, they are properly sued as one, and are collectively referred hereinafter as "PTS."

4.      PTS contracts with corrections and law enforcement agencies, acting on their behalf, under the color of law to exercise official governmental authority to arrest and detain.

5.      The Plaintiff was transported by PTS in February of 2019, from a county jail in Louisville, Kentucky to the county jail in Shawano County, Wisconsin; a road trip in the back of a prison transport van that took multiple days.  During that time, the Plaintiff was subjected to inhumane and tortuous conditions directly caused by PTS' policies, practice, and customs.  PTS knowingly and intentionally conducts its transport operations in a manner that violates constitutionally protected individual rights, human rights, and decency. Moreover, the Defendants breached duties of care owed to the Plaintiff in the manner in which the transport van was equipped and/or operated.

## PARTIES TO THE LAWSUIT

6.      The Plaintiff, CHARLES FRANKLIN, is an adult man currently living in Wisconsin, and is otherwise *sui juris*.

7.      Corporate Defendant, PRISONER TRANSPORTATION SERVICES, INC., is a Tennessee corporation whose principal place of business is Nashville. PRISONER TRANSPORTATION SERVICES, INC. owns each of the other subsidiary limited liability subsidiaries and acts as a managing member.

8.      PRISONER TRANSPORTATION SERVICES, INC.'S subsidiary entities, PTS OF AMERICA LLC, U.S. CORRECTIONS LLC, and BREVARD EXTRADITIONS LLC, are limited liability companies doing business across the country, contracting with state and local governments, correctional facilities, and law enforcement agencies nationwide to transport

arrestees and incarcerated prisoners across jurisdictional lines.   PTS OF AMERICA, U.S. CORRECTIONS, and BREVARD EXTRADITIONS are indistinct from each other in operations, policies, practices, customs, and management.   Based on the total identity of these subsidiaries with each other and PRISONER TRANSPORTATION SERVICES, INC., the four entities are sued here as one, and referred herein as "PTS."

9.      Upon information and belief, the individual John Doe Defendants 1-4 ("DOES") are residents of the United States and were at all times material hereto employed by Corporate Defendants relevant to this Complaint.

10.     Transport officer John Does #1, #2, #3, and #4 (to be named upon discovery), are, or were at all times material hereto, employees of one of the Corporate Defendants and are named in their individual and official capacity.

## GENERAL ALLEGATIONS

11.     The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS, acting under the color of law, knowingly and purposely engaged in customs and practices that had the force of official policy, which were deliberately indifferent to the safety and wellbeing of the prisoners in their custody over whom they have complete control.

12.     The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS used a lack of governmental regulation and/or lack of meaningful governmental oversight to infringe upon the constitutional rights guaranteed to the prisoners in their custody, and to violate tort laws, **for the sake of profit.**  And that PTS **does not** perform transportation of prisoners in any manner similar to the official government agencies upon whose behalf they operate.  And further, that the corporate Defendants have created and operate as a network of different corporations for no legitimate business purpose but to avoid scrutiny of their malign conduct.

13.     PTS'S entire business model relies on its unfettered ability to exploit the inherent vulnerabilities of the prisoners in their custody who are held isolated from the world in cages without the ability to communicate with family or friends for days or weeks at a time, and unable to complain or defend themselves without retaliation.

14.    The Defendants have each, as more fully set forth below, engaged in conduct that violates the Eighth Amendment and state tort laws, purposely and deliberately refusing to provide for the Plaintiff's basic human need for: sleep; the use of a bathroom: hygiene; fresh air; comfort and wellbeing; sanitation; food; water; and medical treatment and prescribed medications -- **cost saving measures that equate to greater profit, at the expense of defenseless people.**

15.     PTS is paid on a "per prisoner/per mile of transport" basis and as a matter of routine, seek to maximize the number of prisoners transported during each trip to make each trip as profitable as possible.  This practice extends individual routes for unreasonable amounts of time causing unsanitary and cramped conditions inside the vans that place the prisoners at increased risk of injury and emotional distress.

16.    The unnecessarily long, circuitous, zigzagging, and/or indirect routes force prisoners to remain in the transport vehicles for days at a time, shackled at the feet, waist, and hands, without adequate ventilation or room to move.

17.    Due to these policies, the transport agents assigned to drive the vans and guard the prisoners travel up to weeks at a time creating great strain and, thus, conditions that make it impossible for them to perform their duties safely and/or humanely.

18.    As a matter of policy, PTS feeds the prisoners the cheapest food possible (without regard to any special dietary restrictions, nutritional value, or the medical needs of individual prisoners),

5

and routinely withholds food and water to reduce the prisoners' need for the toilet in an effort to reduce the time of each trip.

19.     PTS allots only $3.50 per prisoner per meal, causing hunger and dehydration.

20.     To cut expenses and increase profits, PTS maintains a policy that limits the opportunity of the prisoners to sleep outside the transport vans, scheduling rest overnight ("RON") stops every 36 to 72 hours, or more; otherwise, prisoners are expected to sleep shackled while seated on a metal or wooden bench.  Disoriented and sleep-deprived, prisoners often sleep on the floor of the vans which are regularly covered in urine and feces.

21.     To avoid expenditures for medical treatment, PTS ignores *bona fide* medical necessities that arise during transportation.  Refusing medical treatment allows PTS to avoid time delays that affect their ability to complete trips in the shortest amount of time, and to avoid costs of treatment.

22.     As a matter of policy, PTS refuses to allow their agents to provide medical attention unless the condition is a matter of "life or death."  A former manager is quoted as saying, "Unless a medical condition is 'life or death', [they] can't open the cage on the vehicle." However, PTS has no established guidelines, and fails to provide sufficient training to guide their agents to evaluate the severity of a medical condition or the need for treatment.

23.     The combination of all these practices and policies allows PTS to spend the least amount of money, using the least number of employees and transport vans, in the least amount of time, to maximize profits.

### Inadequate Policies for Hiring, Training, Supervision, and Discipline

24.     To save money, PTS maintains a hiring policy that accepts extradition agents who do not possess the experience, temperament, or qualifications to safely transport the prisoners.  To control prisoners, the employees abuse the prisoners physically and verbally -- intentionally over-

tightening restraints, driving recklessly; withholding food and water; using racial epithets and other abusive language.

25.     PTS does not adequately train its agents to understand or enforce prisoner rights and/or has no meaningful or adequate methods of evaluating the training it does provide to ensure proficiency. Training is limited mostly to review of policy paperwork or too brief tutorials – without testing or proficiency evaluation.

26.     PTS has no meaningful program of in-service training and no program of periodic job performance evaluations.  At all times material hereto, what meager training efforts that were implemented were haphazard at best and allowed transfer agents to feel comfortable in their ability to mistreat the prisoners, violating rights and laws without fear of repercussion.

27.     PTS makes little effort and routinely overlooks its agents' failure to comply with the written policies and procedures, including, but not limited to, pre-trip evaluations of medical conditions and necessary medications; documentation of incidents which occur during transportation that effect prisoners' safety and health; provision of medications; and provision of adequate sleep, rest, toilet facilities, and other basic human needs.

28.     This lack of supervision and oversight has resulted in a persistent and widespread pattern of abuse, injury, and death because PTS employees feel comfortable that they violate prisoners' rights without fear of discipline.

29.     PTS'S failure to properly train, supervise, and discipline its employees has resulted in practices and customs that can fairly be said to constitute official policies that deny federally protected constitutional rights and violate tort laws.

30.     PTS'S policies are the direct cause of grossly inhumane conditions and treatment during transportation, resulting in an alarming number of abuses, physical and emotional injuries, assaults, and deaths.

## Policies, Customs, and Practices Violating of Rights

31.    The interior of the vans used by PTS are constructed with cages that resemble those used to control animals and make no accommodation for comfort or safety.  These cages were never intended for long distance human transportation, especially where the transportees are left inside for days at a time.

32.    The vans do not provide adequate light to enter the cages and prisoners are left in darkness for days at a time.

33.     Prisoners are not provided adequate fresh air or ventilation, often sitting claustrophobically in extreme heat or cold without air conditioning or heating.

34.     Prisoners are not provided proper rest during transportation – denied the opportunity to sleep, or even move, for unreasonable periods of time -- or use of a toilet.

35.     To avoid costs, PTS does not contract with secure facilities (jails, police stations, highway patrol outposts) along the preplanned route to provide regular restroom stops.  As a result, the PTS vans are most often turned away and refused access.  This results in denial of restroom breaks for excessively long periods of time, forcing prisoners to micturate and defecate on themselves or onto the floor of the vans.  Prisoners remain soiled in their own excrement for days at a time.

36.     As a regular practice, transport agents instruct prisoners to urinate in empty cups and bottles while they remain shackled and handcuffed.  These receptacles are not regularly emptied or removed from the cages.

37.   Prisoners are denied the opportunity for adequate hygiene such as washing, showering, brushing their teeth, or changing their clothes.

38.   The combination of these malign practices and policies forces prisoners in PTS custody to remain in unsanitary and squalid filth; overtightened restraints; without rest or sleep; disoriented to time and place; and isolated form the world for days at a time; at the mercy of indifferent jailers who are themselves forced to endure intolerable working conditions.

39.   PTS intentionally maintains an employment policy that accepts and anticipates that hired agents will quit within a short period of time (often just a week or two) knowing, or having reason to know, that this results in a transport workforce that is low paid, lacks job satisfaction, experiences significant stress, and is likely to not follow best practices, policies, or any guidelines intended to protect prisoners.

40.   Transport agents use intimidation and violence against the prisoners as methods of control or retaliation if they object to mistreatment, such as verbal threats and abuse; degrading language; use of restraints as weapons to inflict pain; denial of food, water, and/or use of a toilet; and "rough rides" where the van is purposely driven recklessly to frighten the prisoners.

41.   The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS knew, or reasonably should have known, of the widespread nature of these rights and laws violations and refused to take action to correct them, and in fact, chose to permit them to continue because these policies were better for their businesses' bottom line.

## Representations of Efficiency and the Myth of Equivalency

42.   At all times material hereto, PTS was in the business, and did, provide extradition and transportation services for state and local governments, including sheriff's offices, police

departments, state departments of correction, and other government agencies. To conduct these operations, the corporate Defendants assumed the color and duties of governmental authority.

43.     At all times material hereto, PTS represented that its services cost only a fraction of what it would cost official government agencies to transport prisoners. Yet, to fulfill that representation, PTS does not transport prisoners in the same humane manner as official government agencies. It is a myth that the corporate Defendants perform their transport services and treat prisoners in a manner similar to the official government agencies upon whose behalf they operate.

44.     The manner in which PTS transports prisoners is dictated by policies that prioritize cost saving measures over their obligation to safely transport the transportees.  These measures have predictably resulted in grossly unsafe, unsanitary, and inhumane conditions of confinement for the individuals they transport, which constitute violations of constitutional rights and legal duties.

45.      Evidencing these policies, practices, and customs are a disproportionate and alarmingly significant number of injuries, medical emergencies, and deaths.

## Case Sample of Injuries and Deaths

**Tommy Lee Brenton**

46.     In September, 2009, Tommy Lee Benton was transported to Broward County Jail from Hernando (Fla.) County Jail in an eight-person van with 11 other prisoners.  Shackled and chained, he began to complain when he experienced trouble breathing.  When he continued to complain after being told to stop, the van was pulled over and the agents removed him – dragging him to the ground – and kicking him as he lay on the hot pavement.  Four years later, the case was settled for $60,012.00.

**Stephanie Luna**

47.     In July of 2013, Stephanie Luna was transported from Dallas to Houston.   With temperatures outside the van in the nineties and Ms. Luna, shackled in a small sectioned-off cage without a/c vents, became dehydrated and begged for water.  The agents ignored her. Suffering heat exhaustion, her nose began to bleed and she later experienced vaginal bleeding.

**Steven Galack**

48.      In July of 2012, Steven Galack was picked up in Florida for transportation to Butler County, Ohio.  By the third day of the trip, in Georgia, with ten other people in the van, he began to suffer heat related illness and became delusional.  This led to him being removed from the van and stomped on by the guards.  The supervising guard instructed "only body shots."   Seventy miles later in Tennessee, Galack was found dead.  The wrongful death lawsuit was settled.

**William Culpepper**

49.     Galack's death was one of five known to have occurred on a van operated by a PTS subsidiary.  William Culpepper complained of stomach pain for a day and a half before dying of a perforated ulcer.  Guards thought he was faking, so they ignored his pleas for medical care.

**William Weintraub**

50.     In 2014, guards mocked William Weintraub, a physics professor, who complained for days before he was found in the back of a van dead and covered in urine.  He also died from a perforated ulcer.

**Denise Isaacs**

51.     In 2014, Denise Isaacs, age 54, died in Miami onboard a van after she began acting bizarre and started drooling and gasping.  The guards refused to take her to the hospital.  Her autopsy later showed that she died from withdrawal from the anti-anxiety medication, diazepam, which guards were supposed to be giving her and were not.

**Kevin Eli**

52.     In March of 2017, Kevin Eli was being transported from Virginia to Florida to face a nine-year-old burglary charge.  Handcuffed and shackled, he began to complain about having trouble breathing.  When he refused to stop complaining, he was put in a segregation cage.  For the nest 30 minutes, Mr. Eli pleaded with the guards to call 911.  Thinking he was faking, they refused.  Mr. Eli died.  The death investigation also revealed he and other prisoners were also abused and denied basic human rights.  Women were found to be making tampons out of McDonald's wrappers, in front of the male prisoners, and urinating in plastic bottles with the tops cut off.  Prisoners reported being taken on joy rides at high speeds, sometimes crossing the median and knocking into road signs as they were flung around in their cages.

**Theresa Wrigley**

53.     Theresa Wrigley was on Eli's bus and watched him die.  Wrigley, who has diabetes, was being transported from Wisconsin to Florida to face a charge of improperly using a company credit card.  She said that during her two-week journey, she was given her medication intermittently and fed only fast food and that she vomited repeatedly.

**Lauren Sierra**

54.     In 2014, Lauren Sierra was repeatedly sexually assaulted by a PTS extradition agent.

**Joe Mondragon**

55.     In March of 2014, while being driven from New Mexico to Colorado, Joseph Mondragon claims that the guards burned his eye with a cigarette, repeatedly sprayed him with pepper spray, used a derogatory term for Latinos, and forced him to sit in his own feces, urine, and blood.

**Tabitha Phelps**

56.     In June of 2014, Tabitha Phelps was being transported from Joliet, Illinois to Winnebago County Jail in Wisconsin.   During the three-day trip, Phelps was forced to engage in sexual activities with the male inmates and with a guard as other extradition agents stood by watching.

**Roberta Blake**

57.   On August 26, 2014, Roberta Blake was picked up for transport from Ventura, California to Baldwin County, Alabama.  Blake was handcuffed and shackled and put in a small sectioned-off area in the van that had no air conditioning.  She was denied her prescription medicine and medical care after losing consciousness several times.  During the trip, she was not seat-belted and was tossed about the van due to erratic driving by the guards. Because the guards would not give restroom stops, Blake urinated on herself and vomited on herself.   The agents permitted the male prisoners to reach into the cage area and rip off Blake's clothing and then the agents took pictures of her without clothing.  While enroute, she began menstruating.  The guards refused her sanitary napkins, forcing her to use a McDonald's cup and napkins in front of other prisoners and the guards.

**Jeffrey Groover**

58.     In August of 2015, Jeffrey E. Groover was picked up for transport at FCI Butner in North Carolina.  During the 52-hour road trip to Broward County, Groover was forced to sit in a "dog cage" as the van driver called it, which measured just 34 inches wide by 42 inches high.  There was no air conditioning and only one small vent.  The van rarely stopped for breaks.  Groover was allowed just one cup of water and some food every eight hours.  After 24 hours into the trip, Groover suffered delusions and vomited.  The driver gave him an extra cup of water.  Groover suffered heat stroke.

**Darren Richardson**

59.     In 2015, Darren Richardson spent ten days in a van from Florida to Pikes County, Pennsylvania.  During that ten-day ride, the guards put a shotgun to his head, urinated on him, and tried to extort his property.  The guards put him in a cage with shackles so tight that his legs from the knees down turned purple by the time the trip was over.

**Serica Hadnot**

60.     On June 23, 2016, Serica Hadnot, pregnant, was being transported from Hamilton County, Ohio to Marion County, Indiana, a 100-mile trip that took three days.  The extradition agents knew she was pregnant.  During the transport, Hadnot was shackled around her abdomen.  She became overheated numerous times, yet her requests for ventilation were ignored.  Male prisoners were urinating in plastic bottles and throwing the urine at her and other female prisoners.  PTS agents refused her water even though she was dehydrated.  The agents refused to give her pre-natal vitamins, which they possessed.  When she began to bleed from the vagina, her request to go to the doctor were ignored.  As a result, Hadnot suffered a miscarriage.

**Edward Kovari**

61.     On September 12, 2016, Edward Kovari was picked up in Winchester, Virginia for transport to Texas to face charges that he had stolen a car. The charges would later be dismissed. During the trip, Kovari and other inmates, while always shackled, were forced to urinate in bottles, take turns sleeping on the van's floor, and watch as other inmates defecated and vomited in the van and then have to sit in it.  Like this case, Kovari was denied his medication and asked daily to go to the hospital but was denied.  When Kovari finally got to the Harris County, Texas jail, his systolic blood pressure was very high and he was forced to stay in the jail infirmary for two days until his condition stabilized.

**Joseph Jackson**

62.     On June 30, 2016, Joseph Jackson was picked up in Bernalillo County, New Mexico to be transported to Miller County, Arkansas.  Jackson was on medicine for high blood pressure.  The corporate Defendants' agents refused to fill his prescription.  With the high blood pressure, Jackson was to be on a low-sodium, fat-free diet; however, the agents forced him to eat off the Dollar Menu at McDonald's.  Jackson began experiencing visual interference, profuse sweating, and lethargy. Jackson's requests for medicine and alternative food were ignored.   Finally, Jackson lost consciousness in Texas and was hospitalized.

**Rajkumar Dhameja**

63.     From September 28 through October 7, 2016, Rajkumar Dhameja was transported in multiple vans from the Los Angeles County Jail in California to the Norfolk County Jail in Massachusetts.  During the trip, the agents sadistically subjected Mr. Dhameja to a litany of severe physical and psychological abuses during the transport.  The abuses included forcing him to sit

and lie for extended periods in the festering human waste of himself and others; unreasonable tightening of the restraints on his wrists and legs for days for the sole purpose of inflicting pain; allowing 18 hours or more to elapse between restroom breaks even though the vans had no toilets; and failing to seatbelt him or any other people being transported while intentionally and violently swerving the van, accelerating, and slamming on the brakes to inflict pain and injuries on the helpless people inside.

**Luis Hernandez**

65.     On or about March 27, 2017, Luis Hernandez was taken into custody from a detention center in Redwood City, San Mateo County, California based on a 1998 warrant from Broward County, Florida.  Mr. Hernandez had numerous medical ailments requiring specific medications - - including lisinopril, amlodipine, and metformin -- without which he was in danger of stroke, heart attack, kidney failure, or death.  The normally 46 hours of travel to South Florida took over 230 hours -- nearly ten days.  Over the course of the transport, Mr. Hernandez was handcuffed, his legs were shackled, and he was confined to a steel bench on one side of the van.  He was unable to stretch or straighten his legs during the transport because the steel divider was positioned directly in front of him. With barely any room for his shackled legs, his knees would repeatedly hit against the divider.  He was also forced to lean forward in his seat so his head would not strike the top of the van. Mr. Hernandez remained in this same position, without being able to move, walk, or stand, for as many as 12 continuous hours at a time.  His wrists and ankles became severely swollen and his legs completely numb. Mr. Hernandez informed the agents that he was in pain; however, they ignored his complaints. Due to not receiving his medications, Mr.  Hernandez became ill, disoriented, and developed diarrhea, forcing him to defecate on himself in the van. The van was not stopped to allow him to clean himself.   On another occasion, an individual got sick and

vomited in the back of the van. Again, the van was not stopped to clean the mess and Mr. Hernandez was forced to spend days sitting in vomit and his own human waste. Mr. Hernandez was only allowed to shower on two occasions during the ten-day transport. Mr. Hernandez began to become increasingly sick. Once Mr. Hernandez arrived in Fort Lauderdale, Florida, wrist surgery and emergency treatment in the hospital were required to stabilize his condition.

**Hai Nguyen, Eric Buck, Nikia Shelton, and Kelli Tschopp**

65.     In January of 2018, Hai Nguyen, Eric Buck, Nikia Shelton, and Kelli Tschopp, were all transported together in one of the most torturous prisoner transportations in the history of PTS. No prisoner was afforded a seatbelt. During the trip, the van became so hot that prisoners began to complain by shouting and banging on the cages. In response, the PTS agents drove the van recklessly, causing prisoners to be tossed off the benches where they sat and onto the van floor that was covered in urine and feces. Before entering the van, Mr. Nguyen had requested to be seat-belted in, but the agents ignored him. During the "rough ride," Mr. Nguyen suffered injury to his neck which will require surgery. Mr. Nguyen also injured his lower back. He requested medical treatment but was denied. Mr. Buck required emergency hospitalization and medical treatment because transport agents denied his medicine. Both Ms. Tschopp and Ms. Shelton were caused to endure inhumane conditions as were the men, which included but were not limited to, being denied bathroom breaks, being forced to urinate in a bottle, dehydration, malnourishment, and rough rides.

66.     These instances, and dozens of others, including at least five deaths, establish a widespread pattern of which PTS knew, or should have known, thus constituting a policy of deliberate indifference.

67.     As a direct and proximate cause of the policies, customs and practices described herein, as carried out by extradition agents DOES #1 - #4, Plaintiff was subjected to grossly unsanitary and

unsafe conditions of confinement, cruel and inhumane punishment, and suffered physical and emotional injury.

### *THE TRIP*

68.     In February of 2019, Plaintiff was transported by the Defendants from a county jail in Kentucky to a county jail in Shawano County, Wisconsin; a road trip in the back of a prison transport van that took multiple days.

69.     At all times material hereto, DOES #1 through #4 failed to secure the Plaintiff in the van using safety restraints. Plaintiff was placed in full shackles, which included leg irons and handcuffs locked to waist chains.  During the course of transport DOES #1 through #4 operated the van in a negligent manner, failing to obey traffic laws causing Plaintiff to be jostled about the cage in which he was confined causing bruising injuries. Additionally, Plaintiff informed the transport officers his shackles were on too tight. The agents ignored his requests to loosen the shackles.

70.     On the day he was picked up, Plaintiff was provided rest overnight at a jail facility in Missouri.  Thereafter, he was forced to remain in the van for days without sleep as the trip proceeded throughout Missouri, Illinois, and Minnesota.

71.     After resting overnight at a jail in Steele County Minnesota, the Plaintiff was transported to Shawano County, Wisconsin.

72.     During the course of the journey, DOES #1, #2, #3, and #4 refused to provide the Plaintiff and other prisoners adequate restroom breaks, resulting in prisoners urinating and/or defecating in the van.  As a result, the Plaintiff and other prisoners were forced to sit and lie in their own excrement.

73.     The DOE Defendants' failure to provide adequate toileting to humanely accommodate the needs of the Plaintiff and other prisoners and negligent operation of the vehicle was the direct

result of PTS policies and practices intended to complete transportation runs as quickly as possible at the least cost.  Any attempts by the DOE Defendants to provide sufficient restroom breaks, if any such attempts were made, were futile, as PTS prisoners are routinely denied access to jails and other police facilities because PTS failed to pay for such privileges.

74.     Likewise, the DOE Defendants' failure to provide the Plaintiff with safe transportation, adequate hygiene, freedom of movement, adequate ventilation, and protection from extreme temperatures, unsanitary conditions, physical injury, and emotional distress was the direct result of PTS policies and practices intended to complete transportation runs as quickly as possible at the least cost.

75.     At all times throughout the Plaintiff's transportation, when he or other prisoners complained or attempted to complain, voicing protest against the negligent driving and inhumane treatment to which they were subjected, DOES #1, #2, #3 and #4 ignored them.

76.     As a direct and proximate result of PTS policies, customs, and practices, the Plaintiff was subjected to breach of duties owed, cruel and inhumane conditions of confinement by DOES #1, #2, #3 and #4  – erratic driving; sleep deprivation; lack of adequate food, toileting, hygiene, ability to move, unnecessary force resulting in pain; exposure to grossly unsanitary, fetid, overcrowded conditions; extreme emotional distress and anxiety; disorientation and isolation; extreme temperatures; and lack of fresh air causing him difficulty breathing.

## *FEDERAL CAUSES OF ACTION*

<u>**Count I**</u>
<u>**42 U.S.C. §1983 Claim**</u>
**(PTS Defendants)**

77.   Plaintiff hereby incorporates paragraphs 1 through 8 and 11 through 76 above, as if specifically set forth herein.

78.   At all times material hereto, PTS acted under the color of governmental authority and law in performing functions traditionally reserved to the state, namely the extradition and transport of prisoners and pretrial detainees.  Therefore, PTS is a state actor and subject to the same laws and rules applicable to any governmental entity, including the Eighth Amendment and 42 U.S.C. §1983.

79.   While PTS is not vicariously liable for its employees' rights abuses, it is liable for its own policies (or practices and customs that have the force of policy) that become the moving force and allow abuses to occur because the policies encourage a culture that, once entrenched, can rarely be corrected without fundamental change.

80.   At all times material hereto, PTS knew, or reasonably should have known, of numerous rights abuses, deaths, and significant injuries that occurred as a result of established customs and practices – that dictated the manner in which they operated and, therefore, had the equivalency of corporate policy.

81.   At all times material hereto, PTS knew, or reasonably should have known that their adopted policies violated basic human rights constituting cruel and unusual punishment, and that injury to the Plaintiff was foreseeable and in fact, certain to occur.

82.   However, at all times material hereto, PTS remained deliberately indifferent to the foreseeability of injury to the Plaintiff.

83.     As a direct and proximate result of its policies, customs, and practices, PTS caused Plaintiff to suffer physical and emotional injury that continues now and will continue in the future.

**WHEREFORE**, the Plaintiff, CHARLES FRANKLIN, requests this Court to enter judgment against Defendants PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC, PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC, and U.S. CORRECTIONS, LLC, and award the Plaintiff compensatory and punitive damages, as well as costs and attorney fees pursuant to 42 U.S.C §1988, and all other further relief this Court deems just and proper.  Plaintiff demands trial by jury for all issues so triable by right.

**Count II**
**42 U.S.C. §1983 Claim**
**(Defendants DOE #1- #4)**

84.   Plaintiff hereby incorporates paragraphs 1 through 6 and 9 through 76 above, as if specifically set forth herein.

85.   At all times material hereto, each DOE Defendant was a state actor and subject to the same laws and rules applicable to any official government actor, including the Eighth Amendment and 42 U.S.C. §1983.

86.   As stated with particularity above, DOES #1 - #4, as the Plaintiff's jailers, each inflicted cruel and unusual punishment upon the Plaintiff by denying him basic human rights, subjecting him to injury, emotional distress, and needless abuse.

87.     As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary food and water for a prolonged time, causing him physical injury, insomnia, excessive

heat exposure, and dehydration, resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE**, the Plaintiff, CHARLES FRANKLIN, seeks Order of this Honorable Court for judgment against Defendants, DOE #1 through #4, awarding the Plaintiff compensatory and punitive damages, as well as costs and attorney fees pursuant to 42 U.S.C §1988, and all other further relief this Court deems just and proper. Plaintiff demands trial by jury for all issues so triable by right.

### *STATE TORTS*

### Count III
### Breach of Duty - Negligent Operation of a Vehicle
### (PTS Defendants)

88.   Plaintiff hereby incorporates paragraphs 1 through 8 and 11 through 76 above, as if specifically set forth herein.

89.   The PTS Defendants are vicariously liable for the negligent conduct of the employees who operate the vehicles used to transport prisoners in their custody.

90.   At all times material hereto, DOES #1 - #4 had a duty to operate the transport vehicles according to the traffic laws applicable to the state in which the vehicles were travelling.

91.   DOES #1 - #4 routinely violated these traffic laws by exceeding the speed limit, stopping short, unsafe lane changes, erratic driving patterns, making turns in an unsafe manner, overcrowding the vehicle, and/or failing to secure the passengers.

92.   As a direct and proximate result of DOES' #1 - #4 failure to operate the transport van in a safe manner they breached the duties of care owed to the Plaintiff causing him physical and emotional injury, including bruising, pain, and fear for his safety.

**WHEREFORE** the Plaintiff, CHARLES FRANKLIN, seeks judgement of this Honorable Court against Defendants PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC, PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC, and U.S. CORRECTIONS, LLC, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper.  The Plaintiff seeks trial by jury for all causes of action so triable.

<u>**Count IV**</u>
<u>**Breach of Duty - Negligent Training**</u>
**(PTS Defendants)**

92.   Plaintiff hereby incorporates paragraphs 1 through 8 and 11 through 76 above, as if specifically set forth herein.

94.   At all times material hereto, the training of agents, including DOES #1- #4, by PTS and its subsidiaries was conducted jointly and without any difference or distinction.  Therefore, the deficiencies related to training as alleged above pertain to each Defendant entity.

95.   At all times material hereto, PTS owed a duty to the Plaintiff to train DOES #1 - #4 in a reasonable manner intended to protect him from unlawful physical and emotion injury.

96.   Based on the widespread abuses, policy violations, injuries and deaths that were taking place, up to and including the time Plaintiff was injured, PTS knew, or reasonably should have known, that its training and evaluation programs were deficient but failed to correct them.

97.   At all times material hereto, PTS breached that duty – undertaken as a common carrier performing the governmental function of transportation of incarcerated prisoners – to properly train its extradition agents.

98.   As a direct and proximate result of PTS' lack of sufficient training, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary food

and water for a prolonged time, causing him physical injury, starvation, insomnia, excessive heat exposure, and dehydration, resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE** the Plaintiff, CHARLES FRANKLIN, seeks judgement of this Honorable Court against Defendants PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC, PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC, and U.S. CORRECTIONS, LLC, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper.  The Plaintiff seeks trial by jury for all causes of action so triable.

## Count V
### Breach of Duty - Negligent Supervision
#### (PTS Defendants)

99.   Plaintiff hereby incorporates paragraphs 1 through 8 and 11 through 76 above, as if specifically set forth herein.

100.  At all times material hereto, the training of agents, including DOES #1- #4, by PTS and its subsidiaries was conducted jointly and without any difference or distinction.  Therefore, the deficiencies related to training as alleged above pertain to each Defendant entity.

101.  At all times material hereto, PTS owned a duty to the Plaintiff to train DOES #1 - #4 in a reasonable manner intended to protect him from unlawful physical and emotion injury.

102. Based on the widespread abuses, policy violations, injuries, and deaths that were taking place, up to and including the time Plaintiff was injured, PTS knew, or reasonably should have known, that its training and evaluation programs were deficient, but failed to correct them.

103. At all times material hereto, PTS breached that duty – undertaken as a common carrier performing the governmental function of transportation of incarcerated prisoners – to properly supervise its extradition agents.

104. As a direct and proximate result of the PTS' lack of sufficient supervision the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied necessary food and water for a prolonged time, causing him physical injury, starvation, insomnia, excessive heat exposure, and dehydration, resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE** the Plaintiff, CHARLES FRANKLIN, seeks judgement of this Honorable Court against Defendant PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC, PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC, and U.S. CORRECTIONS, LLC, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper. The Plaintiff seeks trial by jury for all causes of action so triable.

### Count VI
### Intentional Infliction of Emotional Distress - State Tort Claim
#### (PTS Defendants)

105. Plaintiff hereby incorporates paragraphs 1 through 8 and 11 through 76 above, as if specifically set forth herein.

106. The malign acts of DOES #1 - #4 were committed in furtherance of PTS' interests for which the company is vicariously liable.

107. Plaintiff alleges that these malign acts were extreme and outrageous, violating norms of decency in a civilized society – even more so where the agents took advantage of the Plaintiff's

vulnerability as a helpless prisoner – and wholly unjustified even in performing the services under difficult circumstances.

108. Abuse of a differential in power is a significant factor in the calculus of infliction of emotional distress.

109. As a direct and proximate result of the Corporate Defendant's agents' abuse of the Plaintiff, he suffered, and continues to suffer, extreme emotional distress in the form of extreme anguish – fearing for his safety during the two trips; enduring injuries and pain for extended periods of time; fearing retaliation if he sought attention; personal degradation and humiliation and continuing emotional and permanent physical injury.

**WHEREFORE,** the Plaintiff, CHARLES FRANKLIN, requests this Court to enter judgment against Defendant PRISONER TRANSPORTATION SERVICES, INC., formerly known as PRISONER TRANSPORTATION SERVICES, LLC, PTS OF AMERICA, LLC, BREVARD EXTRADITIONS LLC, and U.S. CORRECTIONS, LLC, for intentional infliction of emotional distress, awarding compensatory and punitive damages, and all other further relief this Court deems just and proper. Plaintiff demands trial by jury for all issues so triable by right.

DATED this 11th day of November, 2021.

*s / David A. Frankel*
DAVID A. FRANKEL
Law Offices of David A. Frankel, P.A.
Attorneys for Plaintiff
4601 Sheridan Street, Suite 213
Hollywood, FL 33021
(954) 683-0300
David@BlueLotusLaw.com
Doug@BlueLotusLaw.com
eService@BlueLotusLaw.com
Paralegal@BlueLotusLaw.com
FLA. BAR NO. 741779